Matthew J. Langley (Cal. Bar No. 342846)
**ALMEDIA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Ph: (312) 576-3024
Email: matt@almeidalawgroup.com

*Counsel for the Plaintiffs and the Proposed Class*

*[additional counsel listed on signature page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

T.K. and P.M., *on behalf of themselves and all others similarly situated,*

Plaintiffs,

v.

MEDCO 23 LLC AND AFFILIATES d/b/a RUGIET,

Defendant.

Case No.

**PLAINTIFFS' CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1. **Violations of 18 U.S.C. § 2511(1), et seq.;**
2. **Violations of Cal. Penal Code § 631;**
3. **Violations of Cal. Penal Code § 632;**
4. **Violations of Cal. Penal Code § 638.51(a);**
5. **Violations of Cal. Civ. Code §§ 56, et seq.;**
6. **Violations of CALIFORNIA CONSTITUION ART. 1 § 1;**
7. **Common Law Invasion of Privacy – Intrusion Upon Seclusion;**
8. **Negligence; and**
9. **Unjust Enrichment.**

Plaintiffs T.K. and P.M., (collectively, "Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against Defendant MedCo 23 LLC and Affiliates d/b/a Rugiet. ("Rugiet" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by their counsel and review of public documents as to all other matters:

## INTRODUCTION

1. Information concerning an individual's sexual health is among the most sensitive and closely guarded information in our society.

2. The unwanted disclosure of such information can be enormously harmful. And, if people are unable to trust that their sensitive health information will be kept confidential, they are much less likely to seek medical care when they need it most.

3. Rugiet is a telehealth platform operated by MedCo 23 LLC and its affiliates, which markets and sells compounded prescription medications for men's health conditions such as erectile dysfunction ("ED") and premature ejaculation through its Websites, including Rugiet.com.

4. Rugiet markets itself as providing prescription medications for men's health delivered via online consultation and prescription fulfillment.

5. Through Rugiet's Website—www.rugiet.com and its subdomains (collectively the "Website")—potential patients can learn about Rugiet healthcare services, specialties, and treatment plans.[1]

6. The company prompts Website visitors to complete various online forms, including a "Qualify Now" questionnaire Website visitors must complete before they can receive Rugiet's services. Defendant represents that such information will be used solely to provide individualized health insights.

7. As described on its Website, Rugiet claims that it operates in partnership with "U.S.-based FDA-regulated pharmacies," and markets its services as involving a confidential medical intake process. Rugiet further represents that it respects user privacy, is committed to protecting personal information, and recognizes that it collects and handles sensitive health-related information, which it represents is handled securely and privately.[2]

8. These representations are false and misleading. In reality, Rugiet discloses to third

---

[1] *Homepage*, RUGIET, https://www.rugiet.com/ (last visited Oct. 8, 2025).

[2] *Homepage,* RUGIET, https://www.rugiet.com/ (last visited Oct. 8, 2025); *Privacy Policy*, RUGIET, https://rugiet.com/privacy-policy (last visited Dec. 17, 2025).

parties its patients' personal and health-related information for commercial purposes, including for its own targeted advertising of its compounded pharmaceutical products and to allow adtech companies like Google to learn about Rugiet's patients so that Google and its thousands of clients can serve them ads related to their sexual health conditions.

9. Through Rugiet's Website, Defendant collected and transmitted personally identifiable, sensitive health information pertaining to Plaintiffs and other potential patients, including information related to sexual health (collectively, "Sensitive Health Information") to unauthorized third parties, including Google LLC ("Google"), through the use of surreptitious online tracking tools.

10. Online advertising giants, like Google, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives. This information is then used as fuel for a massive, targeted advertising enterprise.

11. Thus, any information about a person captured by these online behemoths can be used to stream ads to that person, among other uses. If Google receives information that a person is concerned about their sexual health, it will collect that information and allow its clients to use that information to stream ads related to sexual health treatments and services to that person's computers and smartphones.

12. Google offers its clients' website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, and Google Tag Manager (collectively, the "Business Tools").

13. Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

14. But, in exchange for access to these Business Tools, website operators install Google's surveillance software on their website (the "Tracking Tools"), including tracking pixels ("Pixels") and third-party cookies that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a

unique identifier that Google uses to identify that user called a Client ID ("CID"), regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

15. In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their website user's privacy.

16. Defendant is one of the companies that has chosen to prioritize its marketing efforts and profits over the privacy of its patients and potential patients by installing Google's Tracking Tools on its Website.

17. Each of the Plaintiffs and Class Members used the Website and had their personal Sensitive Health Information tracked by Defendant using the Tracking Tools. However, Defendant ***never*** obtained authorization from Plaintiffs or Class Members to share their Sensitive Health Information with third parties.

18. At all times relevant to this action, Plaintiffs and Class Members gave no informed consent for information about their Sensitive Health Information to be transmitted to third parties, including Google, the largest advertiser and compiler of user information.

19. Health information is highly regulated by both state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which imposes criminal penalties on disclosing individually identifiable health information ("IIHI") to a third party, including any information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[3]

20. Accordingly, Defendant's disclosure of Plaintiffs' and Class Members' Sensitive Health Information constitutes a violation of HIPAA.

[3] 18 U.S.C. § 1320d-(6).

21. As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages; and (vii) continued and ongoing risk to their Sensitive Health Information.

22. Therefore, Plaintiffs seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: (i) violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq*.; (ii) violations of §§ 631 and 632 of the California Invasion of Privacy Act; (iii) violations of § 638.51 of the California Invasion of Privacy Act; (iv) Invasion of Privacy – Intrusion upon Seclusion; (v) Negligence; and (vi) Unjust Enrichment.

## PARTIES

***Plaintiff T.K.***

23. Plaintiff T.K. is a citizen of the State of California, residing in Contra Costa County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

24. In or around November 2025, Plaintiff T.K. utilized the Website on his personal electronic devices to take Rugiet's "Qualify Now" questionnaire. The questions posed by the questionnaire and Plaintiff T.K.'s responses involved information regarding his ED which was disclosed to third parties, including Google, Microsoft Facebook, and other third parties.

25. For example, the questionnaire asked Plaintiff T.K. "have you ever taken ED medications" and that Plaintiff T.K. answered "yes." Both the question and Plaintiff T.K.'s response were disclosed to other third parties.

26. Further, Plaintiff T.K. in and around November 2025, utilized the Website on his personal electronic devices to purchase Rugiet Ready Pills to treat his ED.

27. Unbeknownst to Plaintiff T.K., the Tracking Tools installed by Defendant on the Website transmitted the Sensitive Health Information regarding Plaintiff T.K.'s sexual health,

including his past use of ED medication, that he communicated while using the Website.

28. The full scope of Defendant's interceptions and disclosures of Plaintiff T.K's communications to Facebook, Google and other third parties can only be determined through formal discovery. However, in addition to disclosing the questionnaire questions and responses, Defendant intercepted at least the following communications about Plaintiff T.K.'s current and past sexual health, including his ED, via long-URLs or substantially similar URLs that were sent to those third parties via the Tracking Tools and which contain information concerning Plaintiff T.K.'s specific medical conditions, queries, and treatments sought:

- https://start.rugiet.com/products/rugiet-ready/quantity-selection
- https://start.rugiet.com/carts
- https://start.rugiet.com/checkout
- https://www.rugiet.com/erectile-dysfunction/ready
- https://www.rugiet.com/select-treatment
- https://start.rugiet.com/products/rugiet-ready/pre_questionnaire
- https://start.rugiet.com/signup
- https://start.rugiet.com/interstitial/results-loader
- https://start.rugiet.com/interstitial/product-info
- https://start.rugiet.com/products/rugiet-ready/intro

29. Plaintiff T.K. never authorized Defendant to disclose any aspect of his communications with Defendant through the Website to third parties, including the Sensitive Health Information that he provided through the Website.

30. On every occasion that he visited the Website, Plaintiff T.K. possessed an account with Google, and he accessed the Website while logged into his Google account on the same device.

31. Plaintiff T.K. has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

32. As a condition of receiving a prescription from Defendant, Plaintiff T.K. provided

his Sensitive Health Information to Defendant via Defendant's Website.

33. Plaintiff T.K. maintained a prescription with Defendant for several months following his initial prescription.

34. After providing his Sensitive Health Information to Defendant through the Website, Plaintiff T.K. immediately began seeing targeted online advertisements for sexual health services and products.

***Plaintiff P.M.***

35. Plaintiff P.M. is a citizen of the State of Illinois, residing in DuPage County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

36. In or around 2021, Plaintiff P.M utilized the Website on his personal electronic devices to take Rugiet's "Qualify Now" questionnaire. The questions posed by the questionnaire and Plaintiff P.M.'s responses involved information regarding his ED which was disclosed to third parties, including Google, Microsoft Facebook, and other third parties.

37. For example, the questionnaire asked Plaintiff P.M. "have you ever taken ED medications" and that Plaintiff P.M. answered "yes." Both the question and Plaintiff P.M.'s response were disclosed to other third parties.

38. Further, Plaintiff P.M. in 2023 and 2025, utilized the Website on his personal electronic devices to purchase Rugiet Ready Pills to treat his ED on two occasions. These purchases were disclosed to Google, Facebook and other third parties.

39. Unbeknownst to Plaintiff P.M., the Tracking Tools installed by Defendant on the Website transmitted the Sensitive Health Information regarding Plaintiff P.M.'s sexual health, including his past use of ED medication, that he communicated while using the Website.

40. The full scope of Defendant's interceptions and disclosures of Plaintiff P.M's communications to Facebook, Google and other third parties can only be determined through formal discovery. However, in addition to disclosing the questionnaire questions and responses, Defendant intercepted at least the following communications about Plaintiff P.M.'s current and past sexual health, including his ED, via long-URLs or substantially similar URLs that were sent to those third parties via the Tracking Tools and which contain information concerning Plaintiff

T.K.'s specific medical conditions, queries, and treatments sought:

- https://start.rugiet.com/products/rugiet-ready/quantity-selection
- https://start.rugiet.com/carts
- https://start.rugiet.com/checkout
- https://www.rugiet.com/erectile-dysfunction/ready
- https://www.rugiet.com/select-treatment
- https://start.rugiet.com/products/rugiet-ready/pre_questionnaire
- https://start.rugiet.com/signup
- https://start.rugiet.com/interstitial/results-loader
- https://start.rugiet.com/interstitial/product-info
- https://start.rugiet.com/products/rugiet-ready/intro

41. Plaintiff P.M. never authorized Defendant to disclose any aspect of his communications with Defendant through the Website to third parties, including the Sensitive Health Information that he provided through the Website.

42. On every occasion that he visited the Website, Plaintiff P.M. possessed an account with Google, and he accessed the Website while logged into his Google account on the same device.

43. Plaintiff T.K. has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

44. As a condition of receiving a prescription from Defendant, Plaintiff P.M. provided his Sensitive Health Information to Defendant via Defendant's Website.

45. Plaintiff P.M. maintained a prescription with Defendant from approximately 2021.

46. After providing his Sensitive Health Information to Defendant through the Website, Plaintiff P.M. immediately began seeing targeted online advertisements for sexual health services and products.

***Defendant Rugiet***

47. Defendant MedCo 23 LLC and Affiliates d/b/a Rugiet is a for-profit corporation incorporated in the State of Texas with its principal place of business at 310 Comal Street, Ste. 223, Austin, Texas 78702, which is in Travis County.

48. MedCo 23 LLC and Affiliates own and operate rugiet.com, rugietmen.com, and related software/apps.

**JURISDICTION AND VENUE**

49. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members in the proposed class, and at least one member of the class, is a citizen of a state different from Defendant.

50. This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws, specifically the ECPA (18 U.S.C. § 2511, *et seq.*).

51. Additionally, this Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because the state statutory and common-law claims are alleged herein form part of the same case or controversy to the federal claims.

52. This Court has specific personal jurisdiction over Defendant Rugiet because it has availed itself of the rights and benefits of the State of California, as well as purposefully directed and expressly aimed its actions in the regular course of business to the State, including by (i) providing services in this District; (ii) conducting substantial business in this District, including, but not limited to, business with Plaintiffs; and (iii) perpetuating unlawful acts or omissions in this District, which give rise to the claims asserted.

53. Venue is proper in this District under 28 U.S.C. § 1391(a)-(d) because a substantial portion of the conduct descripted in this Class Action Complaint giving rise to this action was carried out in this District, including because Defendant collects and redistributes Class Members' Sensitive Health Information in this District; and Defendant caused harm to Class Members

residing in this District, including Plaintiff T.K.

## FACTUAL ALLEGATIONS

### A. DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES.

#### i. Google's Mass Advertising Surveillance Operation.

54. Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[4]

55. In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[5]

56. Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[6]

57. But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[7]

58. Moreover, as Defendant does not disclose its use of Google's Tracking Tools, Plaintiffs and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Website.

---

[4] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively

[5] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last accessed Sept. 7, 2025).

[6] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Sept. 7, 2025).

[7] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last accessed Sept. 7, 2025).

59. Google aggregates the user information that it collects from third-party websites into "advertising profiles" consisting of all of the data that it has collected about a given user.[8]

60. With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[9]

61. Google's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[10] and Google trackers are present on 74-percent of all web traffic.

62. Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

a. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[11] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on

---

[8] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[9] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last accessed Sept. 7, 2025).

[10] Narseo Vallina-Rodriguez & Srikanth Sundaresan*, 7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Sept. 7, 2025).

[11] Darius Tahir & Simon Fondrie-Teitler*, Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last accessed Sept. 7, 2025).

Kroger's website, that information is transmitted to Google.[12]

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[13]

c. 93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[14] In fact, Google advertising trackers were found on 73-percent of pornography websites.[15]

63. This monumental, invasive surveillance of Americans' internet usage and resulting violation of their privacy is not accidental. As Google's then-CEO, Eric Schmit, admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[16]

64. In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus.[17]

65. When website operators, like Defendant, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network and, in return, they benefit from Google's collection of user data at the expense of their website users' privacy.

66. For example, Google rewards website operators for providing it with user

---

[12] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last accessed Sept. 7, 2025).

[13] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[14] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[15] *Id.*

[16] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last accessed Sept. 7, 2025).

[17] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last accessed Mar. 7, 2025) ("Google Analytics gives you the tools, free of charge"),

information by granting such website operators access to its Analytics platform, which then leverages demographic data collected by Google to provide detailed analyses of the website's user base.[18]

67. Unfortunately, it is usually the case that a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[19]

68. And even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[20]

69. Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours—or 30.5 working days—to read the privacy policy of every new website that they visited in a single year.[21]

70. Google is not the only company tracking Americans most sensitive activities, as many other companies have grown by offering data analytics services to companies—often providing a granular level of consumers' behavioral data that even Google may not be collecting. Those companies include Meta Platforms, Inc. (formerly Facebook), Microsoft Corporation, Segment.io, Inc., HubSpot, Inc., Outbrain, Inc., Nextdoor Holdings, Inc., and many others.

**ii. Pixels Can Record Almost Every Interaction Between a User and a Website.**

71. In order to use Google's Business Tools, Defendant installed Google's Tracking Tools, including tracking Pixels, onto the Website.

72. Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

---

[18] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last accessed Mar. 7, 2025).

[19] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[20] *Id.*

[21] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[22]

73. Pixels can collect a shocking amount of information regarding an individual's online behavior—including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form—all transmitted in real-time as the user navigates a website.[23]

74. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third-party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and

---

[22] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last accessed Sept. 7, 2025).

[23] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last accessed Sept. 7, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last accessed Sept. 7, 2025).

other methods that leak personal information to third parties.[24]

**iii. <u>The Pixels Installed on the Website Transmit Personally Identifiable Information and Protected Health Information to Google.</u>**

75. Every website is hosted by a computer "server" that holds the website's contents.

76. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet.

77. Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

78. Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses.

79. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information—the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

80. Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as "cookies" on the user's device.[25] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[26] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[27]

---

[24] *Lurking Beneath the Surface, supra*, n. 22.

[25] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Sept. 7, 2025).

[26] *Id.*

[27] *Id.*

81. When a Google user logs onto their account, their web browser records a Google tracking cookie.[28] This cookie includes a specific line of code that links the web browser to the user's Google account.[29]

82. Google's Pixels use cookies but operate differently than a cookie. Rather than directing the browser to save a file on the user's device, the Pixels acquire information from the browser without notifying the user. The information can include details about the user, his or her interactions with the website, and information about the user's environment (e.g., type of device, type of browser, and sometimes even the physical location of the device), all relayed contemporaneously as the website user navigates the website.

83. Simultaneously, the Google Pixels, like those installed on the Website, request identifying information from any Google cookies previously installed on the user's web browser.

84. The Pixels then combine the data received from the browser with the data acquired from the cookie and instructs the web browser to transmit the information back to Google. As a result, Google can link all of the user information collected by their Pixels to the user's identity, via the user's Google profile. Thus, even if a user never actually logs into a website or fills out a form, the website, along with Google, can know the user's identity.

85. A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[30] When these users visit a website, like those on which the Website has been installed, that utilizes a Google Pixel, any information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

86. However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking

---

[28] Cyphers, *supra*, n.10.

[29] *Id.*

[30] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last accessed Mar. 7, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Sept. 7, 2025).

methods to identify even those few users who do not have a Google account.[31]

87. Google's Pixels, like those on the Website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

88. An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[32] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[33] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

**iv. Defendant Disclosed Plaintiffs' and Class Members' Sensitive Health Information to Google.**

89. Plaintiffs and Class Members used Rugiet's Website to research and access sexual health treatments and services. While visiting Rugiet's Website, Plaintiffs and Class Members each took Rugiet's "Qualify Now" questionnaire.

90. Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Tracking Tools installed on the Website to capture and transmit the Sensitive Health Information that they communicated to Defendant through the Website to third parties, including Google.

91. The following screenshot ("Figure 1") depicts the network transmissions made by the Google Tracking Tools installed on the Website when Website users complete Rugiet's "Qualify Now" questionnaire to evaluate their sexual health through a series of highly sensitive questions. The information provided in Figure 1 is exemplar information collected on the Website, and is not Plaintiffs' information, but the Tracking Tools installed on the Website

---

[31] *See Client ID vs User ID in Google Analytics*, GLIDE AD AGENCY, https://glideagency.com/client-id-vs-user-id-in-google-analytics/ (last accessed Sept. 23, 2025).

[32] Cyphers, *supra*, n.10.

[33] *Id.*

collected the same or similar information about Plaintiffs. As Figure 1 shows, when users complete the "Qualify Now" questionnaire on the Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Website includes confirmation that the user reached the "signup" page, which indicates that the user began and completed the "Qualify Now" questionnaire.




*Figure 1. Screenshot depicting an example question provided in Rugiet "Qualify Now" questionnaire*

**Query String Parameters**

**v:** 2
**tid:** G-7DVLMDNC5X
**gtm:** 45je5ae1h1v895400246z8839206656za200zb839206656zd839206656
**_p:** 1760630243270
**gcd:** 13l3l3l3l1l1
**npa:** 0
**dma:** 0
**cid:** [redacted]
**ul:** en-us
**sr:** 1920x1080
**ir:** 1
**frm:** 0
**pscdl:** noapi
**_eu:** EAAAAAQ
**tag_exp:** 101509157~103116026~103200004~103233427~104527906~104528500~104684208~104684211~104948813~105322304~115480710~115616985~115938465~115938468
**sid:** 1760630197
**sct:** 1
**seg:** 1
**dl:** https://start.rugiet.com/signup
**dr:** https://www.rugiet.com/
**dt:** Rugiet Health
**uid**
**_s:** 1
**tfd:** 442

*Figure 2. Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when Website users take the "Qualify Now" questionnaire. The Client ID has been redacted to preserve confidentiality.*

92. Once a user creates an account, he undergoes additional screening and is recommended a specific Rugiet product based on his answers to the highly sensitive intake questions.

93. The product recommended to the user (the "Go Long" product in Figure 3 below) is, along with the user's CID, transmitted to Google.

Query String Parameters

v: 2
tid: G-7DVLMDNC5X
gtm: 45je5ae1v895400246z8839206656za200zb839206656zd839206656
_p: 1760628644141
gcd: 13l3l3l3l1l1
npa: 0
dma: 0
cid: [redacted]
ul: en-us
sr: 1920x1080
ir: 1
frm: 0
pscdl: noapi
_eu: EAAAAAQ
tag_exp: 101509157~103116026~103200004~103233427~104527906~104528500~104684208~104684211~104948813~115480709~115616985~115938466~115938468
sid: 1760628197
sct: 9
seg: 1
dl: https://start.rugiet.com/products/go-long/intro
dt: Rugiet Health
uid
_s: 1
tfd: 368

*Figure 3. Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when Website users complete additional screening questions. The Client ID has been redacted to preserve confidentiality.*

94. Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiffs to their identities. The Google Pixel on the Website also transmitted the identifier numbers attached to Google's 'CID' cookie, which identifies the user's Google account, along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, IP address, web browser software and version number, and operating system

and version number.

95. Defendant's Website configuration transmitted Google's persistent identifiers, including the _ga client ID, the _gid session ID, the _gcl_au Google Ads click-linking identifier, and the DoubleClick IDE cookie, all of which Google uses to unify user activity across sessions and devices and incorporate that behavior—including ED-intake page navigation—into Google's advertising and audience-segmentation systems.

96. In their default state, Google's Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as the URLs visited by internet users.[34]

97. Defendant purposely configured the Google Pixels on the Website to collect and transmit additional user data, including information related to the "Qualify Now" questionnaire.

98. Defendant's intake flow loaded Google Analytics and Google Tag Manager on every stage of the Rugiet Ready sexual-health questionnaire. Defendant configured Google's Pixels to make repeated requests to analytics.google.com and www.google.com/ccm/collect, as well as Google Ads and DoubleClick endpoints at googleads.g.doubleclick.net. Each request included a full URL parameter revealing the user's location in Defendant's ED intake process, including the product name rugiet-ready and page paths showing user_questionnaires/<id>/questions/<n>.

99. Through these transmissions, Defendant disclosed to Google: (a) the user's navigation through a prescription-only erectile-dysfunction intake questionnaire; (b) the ordering and timing of the questionnaire steps; (c) device, browser, and IP-based location data; (d) event-level signals generated by Tag Manager; and (e) persistent advertising identifiers enabling cross-site linkage. Google could determine that the user was actively seeking treatment for erectile dysfunction, had initiated a pharmaceutical intake process, and was a potential target for health-condition segments, audience building, or remarketing pathways within Google's ad ecosystem.

---

[34] *Automatically Collected Events*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069, (last visited on Mar. 25, 2025).

**v. <u>Defendant Disclosed Plaintiffs' and Class Members' Sensitive Health Information to Numerous Other Third Parties.</u>**

**1. Meta Platforms, Inc.**

100. Meta Platforms, Inc. ("Meta") is one of the world's largest advertising and data-profiling companies, operating Facebook, Instagram, and a vast advertising marketplace that relies on large-scale behavioral surveillance to build profiles of users and non-users alike. Meta's tracking infrastructure, including the Facebook Pixel, enables Meta to collect browsing activity from millions of third-party websites and combine it with its internal user graph for advertising, targeting, and user-identity enrichment.

101. Defendant installed and executed the Meta Pixel on its sexual-health intake flow for all its products, including, for example, its Rugiet Ready erectile-dysfunction product. While Plaintiffs and other users navigated the ED intake questionnaire, Meta received repeated requests to the tracking endpoint at www.facebook.com/tr. These requests were triggered on specific questionnaire steps located at URLs containing products/rugiet-ready/user_questionnaires/.../questions/<n>.

102. The Pixel transmitted the full URL of the ED intake page through the dl parameter, along with the fbp browser identifier and the fbc click identifier, which Meta uses to link a specific browser to its cross-site identity graph and to associate the user's sexual-health questionnaire activity with the behavioral and advertising profile tied to that fbp/fbc record and any corresponding Facebook or Instagram account.

103. Through Defendant's installation and operation of the Meta Pixel, Meta received: (a) the fact that the user was viewing and progressing through an erectile-dysfunction questionnaire; (b) the specific questionnaire step number; (c) the Rugiet Ready product identifier; (d) session timing and sequence of events; and (e) a persistent ID that allowed Meta to link this sexual-health-related behavior to its advertising and identity graph.

104. From this data, Meta learned—and at minimum could infer—that the user was seeking pharmaceutical treatment for erectile dysfunction, was in the process of completing a medical intake form, and was a candidate for targeting or exclusion in Meta's advertising system

for sexual-health-related, pharmaceutical, or male-wellness product categories.

**2. Microsoft Bing Ads and Microsoft Clarity Session Replay**

105. Microsoft Corporation ("Microsoft") operates the Microsoft Bing Ads network and the Microsoft Clarity session-replay analytics platform. Bing Ads enables behavioral advertising across Microsoft-owned and partner properties, while Clarity captures granular behavioral telemetry, including mouse movements, scroll patterns, click locations, page structure, and engagement with on-page components.

106. Defendant deployed both Bing Ads (via bat.bing.com) and Microsoft Clarity (via q.clarity.ms and related endpoints) on the Rugiet Ready intake questionnaire. Defendant's Website network traffic shows Clarity receiving telemetry from the ED intake pages, including the precise URLs for each question in the sexual-health questionnaire. Clarity's payloads confirm that session-level identifiers, events, and page structures were transmitted while users completed or viewed ED-related questions.

107. Defendant's Website configuration transmitted Microsoft's persistent tracking identifiers, including the MUID (Microsoft User ID) cookie used across Bing Ads and Microsoft properties, along with Clarity's own clarity_user_id and clarity_session_id identifiers, which Microsoft uses to track a specific user's behavior across page views, reconstruct session-level interaction, and link that behavioral data to its advertising and analytics infrastructure.

108. As a result of these disclosures, Microsoft received: (a) complete visibility into the user's path through the ED intake questionnaire; (b) detailed behavioral indicators such as clicks, scrolls, and interaction patterns with sexual-health forms; (c) IP-derived geolocation; and (d) persistent Clarity identifiers that enable user-level analytics. From this data, Microsoft learned—and could infer—the user's interest in and engagement with erectile-dysfunction pharmaceutical treatment, their level of interaction with the intake form, and behavioral patterns that could be linked with Microsoft's advertising audiences or used in session-replay reconstructions.

**3. Segment.io, Inc. Analytics**

109. Segment.io, Inc. ("Segment") is a customer-data platform that collects, centralizes, and routes behavioral and event-level data to dozens of downstream advertising, marketing, and

analytics vendors. Segment acts as a data switchboard: any data sent to Segment can be forwarded to a wide set of third-party destinations depending on how the client has configured its integrations.

110. Defendant's Website configuration included persistent identifiers such as Segment's anonymousId, which functions as a browser-level tracking ID, and userId, which ties event data to a specific individual record within Rugiet's system; Segment uses these identifiers to unify behavior into a single user profile and to distribute that profile across any downstream advertising, analytics, or marketing destinations connected to the account.

111. Defendant's intake system transmitted to Segment the most sensitive data Plaintiffs provided on the Website. Specifically, Defendant sent explicit question-and-answer pairs from the sexual-health questionnaire to api.segment.io via the event "Question Answered." Defendant's Website network traffic shows that Defendant disclosed: (a) the text of each ED-related question; (b) the user's exact answer to that question; (c) a persistent anonymousId; (d) an internal userId; and (e) session identifiers. Examples include disclosures that the user indicated anxiety during sex, concern about sexual performance, or prior use of ED medications:




*Figure 4. Screenshot above depicting another example of a question that users are asked on the Website regarding history of ED medications usage.*




*Figure 5. Screenshot depicting back-end network traffic from the Website, showing information transmitted to Segment when Website user answered "yes" to question asking "have you ever taken ed medications?"*

112. Through these transmissions, Segment learned precisely which ED-related medical questions the user was answering, the specific answers the user selected, the order in which the medical questions were completed, and the user's progression through a prescription-only treatment intake. Segment also received stable identifiers enabling cross-session and cross-device tracking, and could forward these events to any number of advertising or analytics integrations, enabling powerful linkage between a user's sexual-health responses and broader digital advertising systems.

**4. HubSpot, Inc. Marketing Automation**

113. HubSpot, Inc. ("HubSpot") provides marketing-automation and customer relationship management ("CRM") tools that track website visitors, tie behavioral data to email identities once known, and automate marketing sequences. HubSpot's trackers include analytics, behavioral tracking, and form-collection systems.

114. Defendant's Website network traffic shows Defendant transmitting ED-intake page views and behavioral metadata to HubSpot via track.hubspot.com. These transmissions included parameters containing the URL of sexual-health questionnaire pages, timestamps, browser identifiers, and session-level metadata.

115. Defendant's Website configuration transmitted HubSpot's hubspotutk cookie,

which serves as HubSpot's primary visitor-level identifier, along with its associated session token parameters; HubSpot uses hubspotutk to link browsing behavior across sessions and to merge a user's ED-related activity with any known email identity once the user interacts with forms or marketing communications—such as here, when Plaintiffs entered their email address on Defendant's online intake form.

116. From this information, HubSpot learned that a particular browser or identified contact had visited erectile-dysfunction intake pages and interacted with sexual-health-related content. HubSpot could infer the user's interest in prescription ED medication, their location within Defendant's sales/marketing funnel, and their potential qualification for targeted email marketing or audience segmentation.

**5. Outbrain Inc. Advertising Network**

117. Outbrain Inc. ("Outbrain") operates a global native-advertising and content-recommendation network. Outbrain's pixels measure conversions, track audience behavior, and route data into its ad marketplace for retargeting and optimization.

118. Defendant transmitted ED-intake URLs to Outbrain through tr.outbrain.com and related endpoints. These requests included parameters revealing the ED questionnaire URLs and user navigation on sexual-health product pages.

119. Defendant's Website configuration transmitted Outbrain's device-level tracking identifiers, including Outbrain's obuid identifier, which Outbrain uses to connect the user's visit to ED-intake pages with its cross-publisher engagement graph and to place that user within Outbrain's behavioral and interest-based advertising cohorts.

120. Through these disclosures, Outbrain learned that the user had visited and interacted with erectile-dysfunction medical-intake pages on Defendant's Website. This enabled Outbrain to classify the user within sexual-health interest cohorts and target or exclude the user in Outbrain's advertising ecosystem.

**6. Nextdoor Holdings, Inc. Advertising**

121. Nextdoor Holdings, Inc. ("Nextdoor") operates an advertising platform integrated into the Nextdoor social-network environment, supporting behavioral ad targeting

across its user base.

122. Defendant's Website configuration demonstrates that Defendant sent tracking requests to ads.nextdoor.com and flask.nextdoor.com containing page-location parameters with ED-intake URLs. These parameters revealed the specific questionnaire pages viewed by the user.

123. Defendant's Website configuration transmitted Nextdoor's ndli and nd_id identifiers (Nextdoor's standard pixel-level tracking parameters), which Nextdoor uses to associate page visits with a persistent advertising identity and to link the user's ED-related activity to Nextdoor's audience-targeting and behavioral-profiling models.

124. Through this data, Nextdoor learned that the user visited erectile-dysfunction intake pages on Defendant's Website and could infer that the user was actively exploring sexual-health treatment. This data can be used to classify the user into interest-based audiences and align marketing campaigns accordingly.

**7. Vibe Pixel and tvspix.com**

125. Vibe and tvspix.com are third-party advertising and analytics pixels used to track conversions, browsing paths, and user engagement across external websites.

126. Defendant's data transmissions to t.vibe.co and tvspix.com included parameters containing the full URL of ED questionnaire pages. These requests occurred while users progressed through the sexual-health intake flow.

127. Defendant's Website configuration transmitted Vibe's browser-level identifiers, including the vguid and vtid tracking parameters embedded in Vibe's pixel requests, which Vibe uses to maintain persistent behavioral records and to attribute ED-related browsing behavior to advertising and conversion paths across its partner network.

128. Defendant's Website configuration also transmitted tvspix's request-level tracking identifiers, including the tvs_id and tvs_session parameters, which this advertising vendor uses to connect individual browsing sessions to persistent behavioral datasets and to map the user's ED-intake activity into its ad-measurement ecosystem.

129. As a result, these third parties received information that the user was engaged in a prescription-related erectile-dysfunction questionnaire. These vendors could infer the user's

health condition and treatment-seeking status, and link that data to broader advertising identifiers and profiling systems.

**8. Ahrefs Pte. Ltd. Analytics**

130. Ahrefs Pte. Ltd. ("Ahrefs") provides analytics tools for understanding site traffic and referral sources. Although primarily an SEO/traffic platform, Ahrefs receives event-level data that includes page URLs and visit information.

131. Defendant transmitted ED-intake page views to analytics.ahrefs.com, disclosing the URLs for sexual-health questionnaire pages. This informed Ahrefs that the user had accessed ED-related medical-intake content.

132. Defendant's Website configuration transmitted Ahrefs' visitor identifiers, including the ahrefs_visit_id and ahrefs_session parameters, which enable Ahrefs to connect specific ED-intake page views to persistent visit and navigation records within its traffic-analytics system.

133. Ahrefs could infer that the user was engaged with prescription sexual-health material and was navigating the medical-intake workflow.

**9. Northbeam Marketing Attribution**

134. Northbeam is a marketing attribution platform used to unify ad-channel performance and user-level purchase behavior across multiple sources.

135. Defendant's Website configuration shows requests to j.northbeam.io associated with page views and events on the Rugiet Ready sexual-health product pages, including the ED-questionnaire steps.

136. Defendant's Website configuration included Northbeam's attribution identifiers, including the nbcid (Northbeam Client ID) and nbclid click-link identifiers, which Northbeam uses to track users across sessions, unify their ED-related activity into a single behavioral profile, and attribute that activity to paid advertising campaigns.

137. Through these transmissions, Northbeam learned that the user was interacting with sexual-health medical-intake content and could infer which campaigns led the user to begin an ED-treatment workflow.

**10. Crazy Egg, Inc. Heatmaps / Behavioral Analytics**

138. Crazy Egg, Inc. ("Crazy Egg") provides heatmapping, click-tracking, scroll-tracking, and behavior-analytics tools that visually reconstruct how users interact with website content.

139. Defendant loaded Crazy Egg scripts during the ED-intake flow. This allowed Crazy Egg to receive event data reflecting how the user interacted with pages containing sexual-health questions, including clicks, scroll patterns, and time spent on sensitive questionnaire steps.

140. Defendant's Website configuration transmitted Crazy Egg's ce_uid and ce_session browser identifiers, which Crazy Egg uses to follow a single user's mouse movements, click patterns, and scroll behavior across ED-intake pages and reconstruct those interactions as a coherent behavioral session.

141. Crazy Egg therefore received behavioral indicators revealing that the user was engaged in an erectile-dysfunction intake process, enabling reconstruction of user behavior on medical-intake screens.

**11. Impact Tech, Inc. Affiliate Tracking**

142. Impact Tech, Inc. ("Impact") provides affiliate tracking infrastructure used to attribute customer conversions to marketing partners. Defendant deployed Impact's tracking through rugiet-health.pxf.io and utt.impactcdn.com.

143. Defendant disclosed ED-product URLs and associated metadata to these Impact endpoints.

144. Defendant's Website configuration transmitted Impact's affiliate-tracking identifiers, including the Impact clickId, SubId, and irclickid values, which Impact uses to follow a specific user through the ED-intake funnel, connect that activity to affiliate partners, and build individual-level behavioral and conversion records for performance marketing.

145. From this data, Impact learned that the user was engaging with erectile-dysfunction product pages and progressing through the commercial funnel leading to potential conversion.

146. Impact could infer that the user was a candidate for ED-medication purchase and

belonged to a sexual-health-related audience segment linked to specific affiliate campaigns.

### B. DEFENDANT DISCLOSED PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT.

#### i. <u>Defendant Failed to Inform Plaintiffs and Class Members of its Disclosure of Their Sensitive Health Information, in Violation of its Express Promises.</u>

147. On its Website, Defendant assures its patients and potential patients that it "understands the importance of confidentiality and privacy regarding [their] personal information," but its actions are inconsistent with this claim.[35]

148. A reasonable user would not understand from Defendant's Privacy Policy that engaging with the site's health-related questionnaires—including providing medical history, lifestyle information, or ED-related symptoms—may be tracked and disclosed to third-party advertising or analytics companies.

149. For example, the Privacy Policy lists sensitive health information in one section and technical tracking tools in another, without ever explaining that data derived from a user's interactions with medical intake pages may be captured by third-party trackers such as Google or any other company.

150. Furthermore, the Privacy Policy's references to cookies, web beacons, and social-media widgets are generic and technical, and would not alert an ordinary consumer that their activity on ED-related pages or forms may be transmitted to external marketing platforms.

151. The Privacy Policy also asserts that the company does not sell or share "Personal Information" except as described, yet later acknowledges that online data partners or vendors may use cookies to associate a user's site activity with other personal information. To a typical consumer, this suggests limited marketing functions—not that intimate health-related interactions are being disclosed to outside tracking ecosystems. In the absence of any clear, plain-language disclosure linking health-form activity to third-party tracking, users are not provided meaningful

[35] *Terms and Conditions*, RUGIET, https://www.rugiet.com/terms-conditions (last visited Dec. 17, 2025)

notice or consent.

152. Defendant breached Plaintiffs' and Class Members' right to privacy by unlawfully disclosing their Sensitive Health Information to third parties, including Google.

153. Specifically, Plaintiffs and Class Members had a reasonable expectation of privacy (based on Defendant's own representations to Plaintiffs and the Class that Defendant would not disclose their Sensitive Health Information to third parties). Defendant did not inform Plaintiffs that it was sharing their Sensitive Health Information with third parties, including Google.

154. By engaging in this improper sharing of information without Plaintiffs' and Class Members' consent, Defendant violated its own express promises and breached Plaintiffs' and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

155. Despite never telling users like Plaintiffs and Class Members, Defendant allowed third parties such as Google to intercept Plaintiffs' and Class Members' Sensitive Health Information and use it for advertising purposes.

**ii. <u>The Tracking Tools Used by Defendant Were Imperceptible to Plaintiffs and Class Members.</u>**

156. The Tracking Tools installed on the Website were invisible to Plaintiffs and Class Members. Without analyzing the network information transmitted by the Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiffs and Class Members, were unable to detect the Tracking Tools on the Website.

157. Plaintiffs and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

158. Plaintiffs and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

159. Because Plaintiffs and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Health Information would be collected and transmitted to

Google, they could not and did not consent to Defendant's conduct.

### C. DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES.

#### i. Defendant Received Material Benefits in Exchange for Plaintiffs' Sensitive Health Information.

160. As explained, *supra*, users of Google's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google's Tracking Tools on its Website.

161. Upon information and good faith belief, Defendant, as a user of Google's Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google to collect Plaintiffs' and Class Members' Sensitive Health Information.

#### ii. Plaintiffs' and Class Members' Data Had Financial Value.

162. Plaintiffs' and Class Members' Sensitive Health Information has value, and Defendant's disclosure and interception of that Sensitive Health Information harmed Plaintiffs and Class Members.

163. According to the annual reports of Facebook, another major online advertising proprietor, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[36]

164. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

165. Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to

[36] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Sept. 7, 2025).

$500,000.[37] In fact, compared to other types of personal data, healthcare data records are by far the most valuable, fetching prices of up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[38]

166. Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

167. The unauthorized disclosure of Plaintiffs' and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm including Plaintiffs and Class Members.

**D. DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATES HIPAA.**

168. The disclosure of Plaintiffs' and Class Members' Sensitive Health Information via the Pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Sensitive Health Information.[39]

169. The HIPAA Privacy Rule sets forth policies to protect all IIHI that is held or transmitted by a covered entity such as Defendant. These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes Protected Health Information ("PHI").[40]

---

[37] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[38] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf

[39] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Mar. 7, 2025).

[40] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy*

*Footnote continued on next page*

170. While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, to perform analysis on data key to operations.

171. Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are simply ***not*** permitted to use tracking technology tools in a way that exposes Sensitive Health Information to any third party without express and informed consent.

172. Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[41]

173. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

174. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

175. Under the HIPAA de-identification rule, health information is not considered individually identifiable under only two circumstances: if, (1) an expert has "determine[d] that the risk is very small that the information could be used, alone or in combination with other

*Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, U.S. HEALTH AND HUMAN SERVICES (last visited Oct. 8, 2023) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

[41] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "document[ed] the methods and results of the analysis that justify such determination.'" Or, (2), if all enumerated identifiers of the individual or their family members are removed, including names, medical record numbers, account numbers, device identifiers, device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying number, characteristic, or code," so that the entity does not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." C.F.R. § 160.514.

176. The HIPAA Privacy Rule requires any "covered entity"—which includes healthcare providers like Rugiet—to maintain appropriate safeguards to protect the privacy of PHI, and set limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

177. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be PHI.

178. The U.S. Department of Health and Human Services ("HHS") has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[42]

179. Consistent with this restriction, the HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization

---

[42] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Sept. 7, 2025).

from each person on the list."[43]

180. Here, Defendant disclosed PHI to third parties in violation of the Privacy Rule—and specifically did so for purposes that include marketing purposes.

181. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

182. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

183. Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

a. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

b. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to IIHI in violation of 45 C.F.R. § 164.306(a)(3);

d. Failing to effectively train its workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

[43] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Mar. 7, 2025).

e. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

184. In its Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, HHS instructed in 2012:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[44]

185. In its Guidance regarding Marketing, HHS further instructed in 2003:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[45]

186. HHS has repeatedly instructed for years that patient status is protected by the HIPAA Privacy Rule:

---

[44] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* (Nov. 26, 2012) at 5, available online at: https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[45] *Marketing*, U.S. HEALTH AND HUMAN SERVICES, https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (April 3, 2003) (last visited Mar. 7, 2025).

"The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

"A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and

It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

187. In other words, HHS has expressly stated that Defendant has violated HIPAA Rules by implementing the Tracking Technologies. Courts, including in this District, have found the same under near-identical circumstances.[46]

**E. PLAINTIFFS' AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY**

188. At all times when Plaintiffs and Class Members provided their Sensitive Health Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Health Information with third parties for a commercial purpose unrelated to providing them with medical care.

189. Defendant even represented that Plaintiff's and Class Members' answers to its "Qualify Now" questionnaire were "private and HIPAA protected," which misled Plaintiff and Class Members that their actions, including the fact that they were answering very sensitive questions—regardless of the answers themselves—were private and *not* being shared with advertising giants like Google so that they could be targeted with ads relating to their health conditions:

[46] *See, e.g.*, *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 928 (D. Minn. 2024).







*Figure 6. Screenshot depicting Defendant purporting to users that answers to questionnaire are private and HIPAA protected.*

190. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

191. For example, a recent Consumer Reports study shows that 92-percent of

Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[47]

192. Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[48]

193. And, in a study performed by the National Institutes of Health, nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[49]

194. Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiffs and Class Members.

## TOLLING AND ESTOPPEL

195. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation of Google's Tracking Tools onto the Website.

196. The Tracking Tools on the Website were and are invisible to the average Website visitor.

197. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

198. Plaintiffs were ignorant of the information essential to pursue their claims, without

---

[47] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Sept. 7, 2025).

[48] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[49] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

any fault or lack of diligence on their part.

199. Defendant had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to patients and potential patients, including Plaintiffs and Class Members, that by taking the "Qualify Now" questionnaire on the Website, Plaintiffs' and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google.

200. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients' and potential patients' Sensitive Health Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its patients or potential patients that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

201. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

202. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Class Action Complaint.

## CLASS ALLEGATIONS

203. This action is brought by the named Plaintiffs on their behalf and on behalf of all other persons similarly situated (the "Class") under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

204. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

**<u>The Nationwide Class</u>**

All natural persons residing in the United States who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google or any other unauthorized third party.

205. The California Sub-Class that Plaintiff T.K. seeks to represent is defined as

follows:

**<u>The California Sub-Class</u>**

All natural persons residing in the state of California who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google or any other unauthorized third party.

206. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

207. Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

208. **<u>Numerosity.</u>** The Class is so numerous that the individual joinder of all members is impracticable. As a major provider of sexual health products across the country, at least 100—and likely many more—patients and other Website users have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

209. **<u>Commonality.</u>** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

210. Whether and to what extent Defendant had a duty to protect the Sensitive Health Information of Plaintiffs and Class Members;

a. Whether Defendant had duties not to disclose the Sensitive Health Information of Plaintiffs and Class Members to unauthorized third parties;

b. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

c. Whether Defendant violated the law by failing to promptly notify Plaintiffs

and Class Members that their Sensitive Health Information was being disclosed without their consent;

d. Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' and potential patients' Sensitive Health Information;

e. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiffs and Class Members free from unauthorized disclosure;

f. Whether Defendant violated the statutes asserted as claims in this Class Action Complaint;

g. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

h. Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy practices; and

i. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Health Information.

211. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

212. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

213. **Predominance**. Defendant has engaged in a common course of conduct toward

Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including Google, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

214. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

215. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

216. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f. Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

217. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names of each Class Members—each of whom completed the "Qualify Now" questionnaire on Defendant's Website—affected by the unauthorized disclosures that have taken place.

## COUNT I

## VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT

## 18 U.S.C. § 2511(1), *et seq.*

## Unauthorized Interception, Use, and Disclosure

**(*On Behalf of Plaintiffs & the Nationwide Class*)**

218. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 217 as if fully set forth herein.

219. The ECPA protects both sending and receipt of communications.

220. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

221. The transmissions of Plaintiffs' Sensitive Health Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

222. Electronic Communications. The transmission of Sensitive Health Information

between Plaintiffs and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

223. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

224. Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

225. Electronic, Mechanical, or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiffs' and Class Members' browsers;

b. Plaintiffs' and Class Members' computing devices;

c. Defendant's web-servers; and

d. The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient and Website user communications.

226. By utilizing and embedding the Pixels and Tracking Tools on the Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

227. Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Pixels and Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Sensitive Health Information to third parties such as

Google.

228. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding their Sensitive Health Information, including information related to the "Qualify Now" questionnaire.

229. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

230. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

231. Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

232. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

233. Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Sensitive Health Information does not qualify for the party exemption.

234. Defendant's acquisition of sensitive communications that was used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a. Invasion of privacy;

b. Negligence;

c. Breach of confidence;

d. Breach of fiduciary duty; and

e. Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3).

235. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiffs and Class Members, without user authorization; and disclosed individually identifiable Sensitive Health Information, including IIHI, to Google without user authorization.

236. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Sensitive Health Information on the Website, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' Sensitive Health Information with Google and other third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know were receiving their Sensitive Health Information, and that Plaintiffs and Class Members did not consent to receive their Sensitive Health Information.

237. As such, Defendant cannot viably claim any exception to ECPA liability.

238. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant have intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiffs or Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' Sensitive Health Information, such as understanding how

people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiffs or Class Members;

d. Defendant failed to provide Plaintiffs and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

e. The diminution in value of Plaintiffs' and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiffs and Class Members intended to remain private, no longer private.

239. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiffs' and Class Members' Sensitive Health Information for financial gain.

240. Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

241. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

242. Any purported consent that Defendant may claim it received from Plaintiffs and Class Members was not valid.

243. In sending and acquiring the content of Plaintiffs' and Class Members' communications relating to their use of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

244. As a result of Defendant's violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT II**

**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**

**Cal. Penal Code § 631**

**(On behalf of Plaintiff T.K. & the California Class)**

245. Plaintiff T.K. (for the purposes of this count, "Plaintiff") repeats and re-alleges each and every allegation contained in paragraphs 1 through 217 as if fully set forth herein.

246. Plaintiff brings this claim under California law.

247. The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

248. CIPA begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code §§ 630

> California Penal Code § 631(a) provides, in pertinent part: Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500)[.]

249. A defendant must show it had the consent of all parties to a communication.

250. At all relevant times, Defendant aided, employed, agreed with, and conspired with Google and other third parties to track and intercept Plaintiff's and California Subclass Members' internet communications while using the Website, specifically by installing and configuring the

Pixel to incercept communication to permit Google to eavesdrop on and intercept in real-time the content of Plaintiff's and California Subclass Members' private communications with Defendant.

251. The content of those conversations included Private Information, such as highly sensitive PHI. Through Defendant's installation and configuration of the Pixels on its Web Properties, these communications were intercepted by Google during the communications and without the knowledge, authorization, or consent of Plaintiff and California Subclass Members.

252. Defendant intentionally inserted an electronic device into its Website that, without the knowledge and consent of Plaintiff and California Subclass Members, transmitted the substance of their confidential communications with Defendants to a third party.

253. Defendant willingly facilitated Google's and other third parties' interception and collection of Plaintiff's and California Subclass Members' private medical information by embedding the Pixel(s) on the Website, thereby assisting Google's and other third parties' eavesdropping.

254. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Pixel falls under the broad catch-all category of "any other manner":

a. The computer codes and programs Google and other third parties used to track Plaintiff's and California Subclass Members' communications while they were navigating the Website;

b. Plaintiff's and California Subclass Members' browsers;

c. Plaintiff's and California Subclass Members' computing and mobile devices;

d. Google's web and ad servers;

e. The web and ad servers from which Google and other third parties tracked and intercepted Plaintiff's and California Subclass Members' communications while they were using a web browser to access or navigate the Website;

f. The computer codes and programs used by Google and other third parties to effectuate its tracking and interception of Plaintiff's and California Subclass Members' communications while they were using a browser to visit the

Website; and

g. The plan Google and other third parties carried out to effectuate its tracking and interception of Plaintiff's and California Subclass Members' communications while they were using a web browser or mobile application to visit the Website.

255. Defendant failed to disclose that it uses the Pixels to track and automatically and simultaneously transmit highly sensitive personal communications to a third party. Defendant is necessarily aware that these communications are confidential as its Website Privacy Policy acknowledges the confidential nature of PHI and disclaims that it is being shared with unidentified third parties without Plaintiff's and California Subclass Members' express authorization.

256. The patient communication information that Defendant transmits while using the Pixel and tracking technologies constitutes IIHI and PHI.

257. As demonstrated hereinabove, Defendant violates CIPA by aiding and permitting third parties, including Google and its agents, employees, and contractors to receive its patients' online communications in real time through its Website without their consent. Google specifically receives the content of these communications and understands it, as the CID is assigned by Google and Google must understand the content in order to process it and link it to individual Users so that Google may target advertising to those persons based on their healthcare choices.

258. By disclosing Plaintiff's and the California Subclass Members' private health information, Defendant violated Plaintiff's and California Subclass Members' statutorily protected right to privacy.

259. As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to Plaintiff and California Subclass Members for treble actual damages related to their loss of privacy in an amount to be determined at trial, or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

260. Under the statute, Defendant is also liable for reasonable attorney's fees, litigation

costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**COUNT III**

**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**

**Cal. Penal Code § 632**

**(On behalf of Plaintiff T.K. & the California Class)**

261. Plaintiff T.K. (for the purposes of this count, "Plaintiff") repeats and re-alleges each and every allegation contained in paragraphs 1 through 217 as if fully set forth herein.

262. Plaintiff brings this claim under California law.

263. The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

264. California Penal Code § 632(a) provides, in pertinent part:

> A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation[.]

265. California Penal Code § 632(c) defines a "confidential communication" as:

> "Any communication carried on in circumstances as may reasonably indicate that any party to the communications desires to be confined to the parties thereto, but excludes a communication made … in any other circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

266. Courts routinely hold that internet communications can have sufficient confidential character to support a section 632 claim.

267. At all relevant times, Defendant aided, employed, agreed with, and conspired with Google and other third parties to record and eavesdrop upon Plaintiff's and California Subclass Members' confidential communications while using the Website, specifically by installing and

configuring the Pixel to permit Google to eavesdrop upon and record the content of Plaintiff's and California Subclass Members' confidential communications with Defendant.

268. The content of those conversations included Private Information, such as highly sensitive PHI. Through Defendant's installation and configuration of the Pixels on its Web Properties, these communications were intercepted by Google during the communications and without the knowledge, authorization, or consent of Plaintiff and California Subclass Members.

269. Defendant intentionally inserted an electronic device into its Website that, without the knowledge and consent of Plaintiff and California Subclass Members, recorded and transmitted the substance of their confidential communications with Defendants to a third party.

270. Defendant willingly facilitated Google's and other third parties' interception and collection of Plaintiff's and California Subclass Members' private health information by embedding the Pixel(s) on the Website, thereby assisting Google's and other third parties' eavesdropping.

271. Plaintiff and California Subclass Members did not know of, and did not consent to, any recording or eavesdropping of these confidential communications.

272. The following items constitute "electronic amplifying or recording device to eavesdrop upon or record the confidential communication" under the CIPA:

a. The computer codes and programs Google and other third parties used to track Plaintiff's and California Subclass Members' communications while they were navigating the Website;

b. Plaintiff's and California Subclass Members' browsers;

c. Plaintiff's and California Subclass Members' computing and mobile devices;

d. Google's web and ad servers;

e. The web and ad servers from which Google and other third parties tracked and intercepted Plaintiff's and California Subclass Members' communications while they were using a web browser to access or navigate the Website;

f. The computer codes and programs used by Google and other third parties to effectuate its tracking and interception of Plaintiff's and California Subclass

Members' communications while they were using a browser to visit the Website; and

g. The plan Google and other third parties carried out to effectuate its tracking and interception of Plaintiff's and California Subclass Members' communications while they were using a web browser or mobile application to visit the Website.

273. Defendant failed to disclose that it uses the Pixels to track and automatically and simultaneously transmit highly sensitive personal communications to a third party. Defendant is necessarily aware that these communications are confidential as its Website Privacy Policy acknowledges the confidential nature of PHI and disclaims that it is being shared with unidentified third parties without Plaintiff's and California Subclass Members' express authorization.

274. The patient communication information that Defendant transmits while using the Pixel and tracking technologies constitutes IIHI and PHI.

275. As demonstrated hereinabove, Defendant violates CIPA by aiding and permitting third parties, including Google and its agents, employees, and contractors to receive its patients' online communications through its Website without their consent. Google specifically receives the content of these communications and understands it, as the CID is assigned by Google and Google must understand the content in order to process it and link it to individual Users so that Google may target advertising to those persons based on their healthcare choices.

276. By disclosing Plaintiff's and the California Subclass Members' private health information, Defendant violated Plaintiff's and California Subclass Members' statutorily protected right to privacy.

277. The data collected by Defendant constituted "confidential communications" as that term is used in section 632, because California Plaintiffs and California Subclass members had objectively reasonable expectations of privacy in their devices and activity when communicating Sensitive Health Information to Defendant.

278. As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to Plaintiff and California Subclass Members for treble actual damages related to their

loss of privacy in an amount to be determined at trial, or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

279. Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**COUNT IV**

**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**

**Cal. Penal Code § 638.51(a)**

**(On behalf of Plaintiff T.K. & the California Subclass)**

280. Plaintiff T.K. (for the purposes of this count, "Plaintiff") repeats and re-alleges each and every allegation contained in paragraphs 1 through 217 as if fully set forth herein.

281. Plaintiff brings this claim under California law.

282. Plaintiff brings this claim in the alternative to, or in addition to, violations of Cal. Penal Code sections 631(a) and 632, which prohibit the interception of the contents of communications in transit. The section 638.51(a) claim is based solely on Defendant's capture of non-content signaling data, such as IP addresses, unique identifiers, and routing metadata, regardless of whether content was also intercepted.

283. CIPA is codified at California Penal Code sections 630–638. The Act begins with its statement of purpose in California Penal Code section 630:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

284. CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

285. A "pen register" is "a device or process that records or decodes dialing, routing,

addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

286. The Tracking Tools are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address and other device identifier information such as device type, browser type, unique cookie identifiers, session identifiers, referrer URLs, user-agent strings, clickstream paths, and timestamped navigation or submission data ("Device Metadata")—from the electronic communications transmitted by Plaintiff's and the California Subclass members' computers, tablets or smartphones. Cal. Penal Code § 638.50(b).

287. Likewise, the Tracking Tools are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the unique user identifiers associated with each Product from the electronic communications transmitted by Plaintiff's and the California Subclass members' computers, tablets or smartphones. Cal. Penal Code § 638.50(b). The unique IDs are "addressing" information because they are used to tie a Website user to third parties' databases and repositories of information about the user and ascertain the user's identity.

288. At all relevant times, Rugiet installed the Tracking Tools—which include pen registers—on Plaintiff's and California Subclass members' browsers, and used the Tracking Tools to collect Plaintiff's and California Subclass members' IP addresses and Device Metadata.

289. The Tracking Tools collect Plaintiff's and California Subclass members' IP addresses and Device Metadata independent of the contents it also collects of Plaintiff's and the California Subclass members' electronic communications with Defendant. See *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

290. Plaintiff and California Subclass members did not provide their prior consent to Defendant's use of the Tracking Tools to collect their IP addresses and Device Metadata.

291. Defendant did not obtain a court order to install or use the Tracking Tools.

292. Defendant, in its conduct alleged here, was not providing an "electronic communication service" as that term is defined in 18 United States Code section 2510(12) and used in the Wiretap Act. Defendant was not acting as an Internet Service Provider.

293. Even if Defendant did qualify as an "electronic communication service" provider, (i) it did not install or use pen registers solely for the purpose of operating or protecting its own service, but instead used them for analytics, marketing, behavioral profiling, or unauthorized surveillance; and (ii) its deployment of pen registers in this context exceeds the narrow technical exception set forth in § 638.51(b), as it permitted third parties (e.g., data analytics or tracking vendors) to receive, process, or store these intercepted signals without user consent or judicial oversight.

294. Defendant's use of the Tracking Tools to act as pen registers for the purpose of creating, and aiding third parties to create, valuable behavioral and advertising profiles about Plaintiff and California Subclass members without their consent constitutes a redressible concrete harm.

295. Pursuant to Cal. Penal Code section 637.2, Plaintiff and California Subclass members have been injured by Defendant's violations of CIPA section 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA section 638.51(a). Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

296. Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## COUNT V

## VIOLATIONS OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT

**Cal. Civ. Code §§ 56, *et seq*.**

**(On behalf of Plaintiff T.K. & the California Subclass)**

297. Plaintiff T.K. (for the purposes of this count, "Plaintiff") repeats and re-alleges

each and every allegation contained in paragraphs 1 through 217 as if fully set forth herein.

298. Plaintiff brings this claim under California law.

299. The California Confidentiality of Medical Information Act, California Civil Code §§ 56, et seq. ("CMIA") prohibits health care providers from disclosing medical information relating to their patients without patient authorization. "Medical information" refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental or physical condition, or treatment. 'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual[.]" CAL. CIV. CODE § 56.05.

300. Defendant is a "provider of health care" as defined by California Civil Code § 56.06(b).

301. Plaintiff and California Subclass Members are patients, and, as health care providers, Defendant had an ongoing obligation to comply with the CMIA's requirements. As set forth above, device identifiers, web URLs, Internet Protocol (IP) addresses, and other characteristics that can uniquely identify Plaintiff and California Subclass Members are transmitted from within the State of California to Defendants in combination with patient medical conditions, medical concerns, treatment(s) sought by the patients, and doctors viewed along with the medical specialty of the doctor(s) searched for and viewed by patients. This is protected health information under the CMIA.

302. This private medical information is intercepted and transmitted within the State of California to third parties including Google and Segment and their agents, employees, and contactors via Defendant's knowing and intentional decision to embed enabling software into its Website.

303. CID is also an identifier sufficient to allow identification of an individual. Along with patients' CID, Defendant discloses to third parties including Google and its agents, employees, and contactors several pieces of information regarding patient use of its Website including but not limited to the following: patient medical conditions, medical concerns,

treatment(s) sought by the patients, and medical specialty of the doctor(s) searched for by patients.

304. The information described above constitutes medical information pursuant to the CMIA because it is patient information derived from a provider of health care regarding patients' medical treatment and physical condition, and this medical information is linked with individually identifying information. CAL. CIV. CODE § 56.05(i).

305. As demonstrated hereinabove, Defendant failed to obtain its patients' authorization for the disclosure of medical information and fails to disclose in their Website Privacy Policy that it shares Sensitive Health Information with Google or other third parties for marketing purposes.

306. Pursuant to CMIA Section 56.11, a valid authorization for disclosure of medical information must be: (1) "Clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization;" (2) signed and dated by the patient or his representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Accordingly, the information set forth in Defendant's Website Privacy Policy does not qualify as a valid authorization.

307. As described above, Defendant is violating the CMIA by disclosing its patients' medical information to third parties, including Google and Segment and their agents, employees, and contractors along with the patients' individually identifying information. Accordingly, Plaintiff and California Subclass Members seek all relief available for Defendant's CMIA violations.

308. Plaintiff and Class Members seek statutory damages, compensatory damages, punitive damages, attorney fees, and costs of litigation for Defendant's violation(s) of the CMIA.

## COUNT VI

## INVASION OF PRIVACY—CALIFORNIA CONSTITUION

## ART. 1 § 1

## (On behalf of Plaintiff T.K. & the California Subclass)

309. Plaintiff T.K. (for the purposes of this count, "Plaintiff") repeats the allegations

contained in paragraphs 1 through 217 as if fully set forth herein and bring this count on behalf of himself and proposed California Subclass.

310. Plaintiff brings this claim under California law.

311. Plaintiff and California Subclass Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and California Subclass Members' knowledge or consent.

312. At all relevant times, by using Google's and other third parties' tracking pixel(s) to record and communicate patients' CIDs and other individually identifying information alongside their confidential medical communications, Defendant intentionally invaded Plaintiff's and California Subclass Members' privacy rights under the California Constitution.

313. Plaintiff and California Subclass Members had a reasonable expectation that their communications, identity, health information, and other data would remain confidential, and that Defendant would not install wiretaps on its Website to secretly transmit communications to a third party.

314. Plaintiff and California Subclass Members did not authorize Defendant to record and transmit Plaintiff's and California Subclass Members' private medical communications alongside their personally identifiable health information.

315. This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications. Moreover, it constitutes an egregious breach of the societal norms underlying the privacy right.

316. As a result of Defendant's actions, Plaintiff and California Subclass Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

317. Plaintiff and California Subclass Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages and an injunction that prevents Defendant from engaging in the

same or similar conduct in the future.

318. Plaintiff and California Subclass Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and California Subclass Members for the harm to their privacy interests as a result of the intrusion(s) upon Plaintiff's and California Subclass Members' privacy.

319. Plaintiff and California Subclass Members are further entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and California Subclass Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

320. Plaintiff seeks all other relief as the Court may deem just, proper, and available for invasion of privacy under the California Constitution.

**COUNT VII**

**COMMON LAW INVASION OF PRIVACY – INTRUSTION UPON SECLUSION**

***(On Behalf of Plaintiffs & the Nationwide Class)***

321. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 217 as if fully set forth herein.

322. Plaintiffs bring this claim under California law.

323. Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, highly personal Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiffs' and Class Members' knowledge or consent.

324. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendants via the Website and the communications platforms and services therein.

325. Plaintiffs and Class Members communicated Sensitive Health Information that they intended for only Defendants to receive and that they understood Defendants would keep

private and secure.

326. Defendants' interception and disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

327. Plaintiffs and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

328. Defendants' disclosure and publicization of Plaintiffs' and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

329. As a result of Defendants' actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

330. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to compensatory and/or nominal damages.

331. Plaintiffs and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

332. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendants' actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

333. Plaintiffs also seek such other relief as the Court may deem just and proper.

## COUNT VIII

## NEGLIGENCE

***(On Behalf of Plaintiffs & the Nationwide Class)***

334. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 217 as if fully set forth herein.

335. Plaintiffs bring this claim under California law.

336. Through their use of the Website, Plaintiffs and Class Members provided Defendant with their Sensitive Health Information, believing such Information would be kept confidential.

337. By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

338. Defendant negligently failed to take reasonable steps to protect Plaintiffs' and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to Google.

339. Defendant further negligently omitted to inform Plaintiffs and Class Members that it would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

340. Defendant knew, or reasonably should have known, that Plaintiffs and Class Members would not have provided their Sensitive Health Information to Defendant had they known that Defendant intended to use that Information for unlawful purposes.

341. Defendant's conduct has caused Plaintiffs and Class Members to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

342. Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages.

343. Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**<u>COUNT IX</u>**

**UNJUST ENRICHMENT**

***(On Behalf of Plaintiffs & the Nationwide Class)***

344. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 217 as if fully set forth herein.

345. Plaintiffs bring this claim under California law.

346. Plaintiffs and Class Members conferred a monetary benefit on Defendant in exchange for healthcare services. Specifically, they provided their Sensitive Health Information to Defendant which Defendant then utilized for marketing and advertising purposes, as described, supra.

347. Defendant knew that Plaintiffs and Class Members conferred a benefit upon them, which Defendant accepted. Defendant profited from the Sensitive Health Information of Plaintiffs and Class Members by exchanging it for marketing and advertising services.

348. In particular, Defendant enriched itself by obtaining the inherent value of Plaintiffs' and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiffs' and Class Members' Sensitive Health Information.

349. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of its patients' and potential patients' Sensitive Health Information.

350. Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiffs' and Class Members' Sensitive Health Information.

351. If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendant.

352. Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual

has not suffered a corresponding loss in the form of money damages.

353. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer injury.

354. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and other Class Members, pray for judgment against Defendant as follows:

a. an Order certifying the Nationwide Class and appointing the Plaintiffs and their Counsel to represent the Classes;

b. equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiffs and Class Members;

c. injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

d. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

e. an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f. prejudgment interest on all amounts awarded; and

g. all such other and further relief as this Court may deem just and proper.

Dated: December 22, 2025

Respectfully submitted,

By: /s/ *Matthew J. Langley*

Matthew J. Langley (Ca. Bar No.: 342846)
David S. Almeida*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Ph: (312) 576-3024
E: matt@almeidalawgroup.com
E: david@almeidalawgroup.com

Andrew R. Tate*
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE, LLP**
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
Ph: (314) 669-3600
E: atate@peifferwolf.com

Brandon M. Wise*
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE, LLP**
One US Bank Plaza, Suite 1950
St. Louis, MO 63101
Ph: (314) 833-4825
E: bwise@peifferwolf.com

*Counsel for Plaintiffs and the Proposed Class*

**To be admitted Pro Hac Vice*